# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

CASE NO.:

1872 HOLDINGS INTERNATIONAL, LLC,

    Plaintiff,

v.

ZAMORA COMPANY GLOBAL, S.L.U.,

    Defendant.
_____/

## COMPLAINT

Plaintiff, 1872 Holdings International, LLC ("1872" or "Matusalem"), hereby files this Complaint and sues Defendant, Zamora Company Global, S.L.U. ("Zamora" or the "Distributor").

## INTRODUCTION

1. Matusalem brings this action because of Zamora's repeated breaches of the parties' December 30, 2019 Second Amended and Restated Distribution Agreement (the "Agreement").[1] The Agreement specifies the rights and duties of Matusalem – the manufacturer of a line of premium Dominican rums of the same name – and Zamora, Matusalem's exclusive distributor in Spain. Zamora's primary, overarching obligation under the parties' Agreement is to "use its commercially reasonable efforts to distribute, sell and expand the market for [Matusalem's] Products in the Territory." The parties expressly defined "commercially reasonable efforts" as "use[ing] at least the same effort, diligence and attention to the distribution, sale and marketing of each of [Matusalem's] Products as the Distributor uses in the distribution, sale and marketing of its other major brands in the Territory." As detailed herein, Zamora has failed to honor that promise and others, which continues to cause damage to 1872's brand in an important international market.

---

[1] Because the Agreement contains a confidentiality provision (at ¶11), it is incorporated herein by reference. The Agreement may be filed with the Court under seal at a later stage if appropriate.

### PARTIES

2.      1872 is a Florida LLC with its principal place of business in Miami, Florida. While 1872 is held as part of a complex corporate structure, the ultimate corporate owner of 1872 is a Florida Limited Partnership, all of the partners of which are Floridians or limited liability companies whose members are Floridians. As such, Plaintiff 1872 is a citizen of Florida.

3.      Zamora is, on information and belief, a single-shareholder "Sociedad Limitada Unipersonal," the owner of which is a citizen of Spain. As such, Defendant Zamora is a citizen of Spain.

### JURISDICTION AND VENUE

4.      This Court has personal jurisdiction, both specific and general, over Zamora in this action because a substantial part of the events or omissions giving rise to the claim occurred in Miami, Florida and Zamora agreed that any claim arising out of or related to the Agreement would be brought in this jurisdiction. Agreement at ¶15.2.

5.      The Court has subject matter jurisdiction over this action under 28 U.S.C. §1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between a citizen of Florida and a foreign citizen. Specifically, 1872 is a citizen of Florida and Zamora is a citizen of Spain.

6.      Venue is proper in this Court under 28 U.S.C. §1391(b)(2)-(3) because: (a) "a substantial part of the events or omissions giving rise to the claim occurred" in this judicial district; and, alternatively, (b) Defendant Zamora is subject to the Court's personal jurisdiction with respect to this action. Moreover, the parties expressly agreed that Miami would be the exclusive venue for "any unresolved controversy or claim arising out of or related to" the Agreement (Agreement at ¶15.2), and the Agreement is governed by Florida law (Agreement at ¶15.1).

**FACTUAL BACKGROUND**

**The Parties' Distribution Agreement**

7. 1872 is engaged in the sale, exportation, distribution, licensing, manufacturing, and bottling of rum and other alcoholic and non-alcoholic beverages under the trademark "Matusalem." Matusalem rum has been in production since it was first distilled in Cuba in 1872, and today it is one of the world's premier Dominican rums. Matusalem rum comes in five age categories, which range from its "Añejo" product up to its flagship "Gran Reserva 23" offering.

8. Zamora is an international company engaged in the importation, distribution, promotion, and sale of alcoholic beverages in Spain's domestic market, which includes, *inter alia*, Gibraltar and the Canary Islands. Zamora owns its own liquor brands – including well-known brands Licor 43 and Martin Miller's Gin – and Zamora distributes other third-party owned brands in territories around the world.

9. On December 30, 2019, the parties entered into the Agreement, whereby Zamora became the exclusive distributor of Matusalem rum in Spain. The parties' Agreement is a detailed and comprehensive document that sets forth both sides' responsibilities over its five-year term.

10. Because Matusalem is a valuable international brand, first and foremost amongst the Distributor's duties – indeed, the *sine qua non* of the entire arrangement – is the obligation to "use its commercially reasonable efforts to distribute, sell and expand the market for [Matusalem's] Products in the Territory." Agreement at ¶8.1. And because Zamora promotes both its own products and those of other companies, the parties chose to expressly define the term "commercially reasonable efforts" to mean "use[ing] at least the same effort, diligence and attention to the distribution, sale and marketing of each of [Matusalem's] Products as the Distributor uses in the distribution, sale and marketing of its other major brands in the Territory." *Id.*

11. The parties' distribution arrangement required Zamora to purchase defined quantities of Matusalem's products at agreed-upon prices, which Zamora would then resell in the Spanish market. 1872 also paid Zamora specified amounts to be used for marketing efforts, which amounts were tied to Zamora's purchase Matusalem's products. Zamora was permitted to resell those products to its Spanish customers at a profit, and the Agreement provided for incentive payments to Zamora if it hit specified targets for purchases of those products and otherwise complied with the Agreement.

### Covid 19 Impacts Zamora's Ability to Sell 1872's Products

12. But almost immediately after the parties executed the Agreement, the Covid 19 pandemic began in China and spread quickly to Europe. By Spring 2020, Covid-19 was widespread in Spain, which was one of the first nations to initiate a shutdown of public activities in an effort to combat the virus.

13. The result was an immediate diminution it the market for Matusalem's products as bars, restaurants, and other large consumers of alcoholic beverages were forced to close.

14. Zamora began to communicate its concerns about the effect of the pandemic upon its efforts to market and sell Matusalem's products in a series of emails to 1972 during the Spring of 2021. Simply put, Zamora expressed its fear that it would not be able to sell all of the Matusalem product that the Agreement incentivized it to purchase from 1872.

15. But the parties' Agreement did not leave Zamora without recourse given those difficult market conditions. As an initial matter, Zamora could simply reduce the quantities of product it purchased from 1872 – even if that meant that it would not earn performance bonuses. Moreover, the Agreement contains a Force Majeure provision that would allow either party to suspend its performance in accordance with an agreed-upon procedure in the event of a situation like the Covid-19 pandemic.

**Zamora Begins to Stockpile Matusalem's Products**

16. But Zamora did not reduce its purchases of product *or* trigger the force majeure provision. Rather, it chose to continue ordering Matusalem product that it knew it could not sell.

17. The net result of Zamora's decision to buy product for which there was no market in order to achieve performance bonuses was that its in-country stockpiles of Matusalem's products skyrocketed over 2020 and 2021.

18. Zamora's ever-increasing inventory of unsold product ensured that Zamora would not be able to hit its purchase targets beginning in 2022. But because the Agreement created sales incentives for 2020 and 2021, Zamora chose to sacrifice its future performance – and the vitality of Matusalem's products in the Spanish market – in favor of short-term financial pay-outs.

19. Thus Zamora is a train running full speed toward a track it knows is washed-out. Simply put, Zamora's eventual breach of the Agreement's requirement that it purchase defined quantities of Matusalem's products is both inevitable and self-evident.

20. Thus Zamora has manifest a clear intent not to perform its obligation to purchase product under the Parties' Agreement.

21. Meanwhile, in early 2021, Zamora lay claim to a contractual bonus of €400,000 that the Agreement prescribed for certain purchasing levels. That is, Zamora sought be bonused for buying product that it knew it could not resell.

**Zamora Fails to Provide Contractually Mandated Reporting**

22. While it was becoming increasingly clear to 1872 by late 2020 that the Distributor was stockpiling Matusalem product, 1872 lacked full visibility Zamora's sales and marketing efforts because Zamora was not complying with its contractual reporting obligations.

23. The parties' Agreement required Zamora to provide very detailed monthly and quarterly reporting to 1872 in order to allow 1872 to closely monitor how its brand was being managed in Spain.

24. Specifically, at paragraph 8.7 of the Agreement, Zamora was obligated to provide a series of reports within 15 days of the end of every calendar month, including detailed descriptions of month-end inventories, marketing reports, forecasts of demand and inventory levels, and direct sales information.

25. Further, within 30 days of the end of every four-month period, Zamora was obligated to produce detailed marketing reports and going-forward marketing plans for 1872's products.

26. But despite repeated requests from 1872's Spanish employees at the end of 2020 and the beginning of 2021, Zamora did not produce that information.

27. Accordingly, by letter dated February 10, 2021 from the Chairman of 1872's Board of Directors, Claudio Alvarez ("Dr. Alvarez"), to Zamora's Managing Director, Emilio Restory Cabrera ("Mr. Cabrera"), 1872 formally requested the missing information.

28. Specifically, Dr. Alvarez wrote:

    1) Please ensure that all purchase orders placed contain Zamora's estimated rolling consecutive three-month requirements of Products, as that information has been absent from purchase orders to date;

    2) For each calendar month, please ensure that we promptly get:

        a. Zamora's estimated depletion amount and month-end inventory amount (in each case by product and SKU) for the month in question;
        b. a three-months forecast for product demand and shipment demands, together with the estimated inventory level for the products at the end of each quarter (by SKU) that will occur as a result of the demand and of the shipments;
        c. direct sales information of our products, including account name and SKU purchase detail for all key accounts (including a list of all such accounts);

      d. a monthly market report (Nielson data);
      e. a 12-month rolling forecast of product demand (by SKU); and
      f. related party information pertaining to the sale of our products.

. . .

3) Please ensure that at the end of every four month-period Zamora provides us with:

      a. Marketing results for the previous four months;
      b. A marketing and sales plan for the next four-month cycle after each four-month report;
      c. Documented expenditures for all advertising and promotions (both IPMA ["an investment plan for marketing actions"] and IPCA ["an investment plan for commercial actions"]; and
      d. The portion representing Matusalem's products on each of the foregoing reports.

. . .

4) Please provide a report (with invoice backup) indicating expenditures for AMP [advertising, marketing and promotions] (both for 2020 and projections for 2021); and

5) Please indicate to us how (by type of expenditures and to whom) the IPCA funds were spent in order to meet the budget (both for 2020 and projections for 2021); and

6) I am hereby requesting that Zamora provide us a detailed explanation for how the IPCA portion of the Matusalem marketing budget was spent in 2020, including invoices reflecting the expenditures of all lPCA funds.

29. And Dr. Alvarez clearly explained that the reports required by the Agreement were necessary given 1872's ongoing concern about Zamora's stockpiling of inventory of 1872 product:

> Setting aside that all of the foregoing is required under the parties' agreement, we are requesting this information to assess Zamora's sales information and inventory levels. As we have discussed, we are very concerned about the negative impact on the Matusalem brand that comes from elevated inventory levels, both in the short and long term. More specifically, we are extremely concerned about Zamora's increasing inventory surplus amount.

30. Mr. Cabrera responded with a letter dated February 23, 2021, in which, *inter alia*, he acknowledged that all of the required information had not been provided but asserted that the parties' "established practice" had been to ignore the full reporting required under the Agreement.

31. Thus Zamora took the position that 1872 had waived its right to demand strict compliance with the Agreement. Accordingly, Zamora agreed to provide the requested reports on a going-forward basis, "but not retroactively."

32. Of course, the Distributor's position ignored the Agreement's express "Non-Waiver" provision (¶20), which made clear that any prior failure by 1872 to "insist upon the strict performance of" the Agreement would not constitute a waiver of its right to do so.

33. And after acknowledging its reporting failures, Zamora nonetheless demanded payment of an incentive award that Zamora claimed to be due as a result of its 2020 performance.

**1872 Exercises its Contractual Right to Audit Zamora's Records**

34. As such, while Zamora was requesting payment of the incentive award, it was not providing 1872 with the contractually mandated reporting. That failure made it difficult for 1872 to assess Zamora's claimed entitlement to the bonus.

35. Faced with growing concerns about product inventory levels and Zamora's express refusal to provide requisite financial reporting, 1872 decided to avail itself of the audit mechanism found at ¶8.7 of the Agreement.

36. That provision specifies that Zamora must "keep records of inventory of Products and all sales of the Products in the Territory," and states that 1872 has the right to audit "all such records and financial data" as are "reasonably necessary to verify the sales and development of the Products by the Distributor within the territory." Such materials specifically include, *inter alia*, "the Distributor's direct sales information."

37. Accordingly, by letter dated March 2, 2021, Dr. Alvarez reiterated that Zamora had failed and refused to provide requisite financial reporting:

> Specifically, Zamora has failed to: (1) include Zamora's estimated rolling consecutive three-month requirements of Products in its purchase orders; (2) provide complete monthly reports, including estimated depletion and month-end inventory amounts, three-month sales and quarterly inventory levels, 12-month

forecast of product demand, and related-party information; (3) provide complete reports on a four-month basis, including documentation of expenditures for all advertising and promotions (both IPMA and IPCA), specification of the portion of such expenditures representing Matusalem's products, and four-month marketing and sales plans; [and] (4) [provide] 2020 expenditures for AMP, details regarding the expenditure of IPCA funds for 2020, and a detailed, documented explanation for how the IPCA portion of the Matusalem marketing budget was spent in 2020.

38. And as a result of Zamora's refusal to produce the foregoing information voluntarily, Dr. Alvarez formally invoked 1872's contractual right to audit Zamora's books and records:

Zamora's aforementioned refusal to provide missing information for prior reporting periods and failure to address the problem of an ever-increasing product inventory makes it necessary for 1872 to exercise its right pursuant to paragraph 8.7 of the Agreement to demand an audit of Zamora's records, including all records regarding the inventory of our products and all sales of our products in Zamora's territory, as well as all other financial data related to Zamora's performance under our agreement. We are in the process of retaining a local auditor to assist us in that effort, but I am hereby giving you written notice of our intention to proceed with that audit starting ten (10) days from the date of this letter.

39. Accordingly, in March 2021, 1872 retained a third-party auditing company and initiated an audit of Zamora's financial records (the "Audit").

### The Audit Reveals Zamora's Questionable Marketing Efforts and its Failure to Promote Matusalem's Products

40. And while Zamora acknowledged 1872's contractual right to conduct the Audit, Zamora treated the Audit much as it had treated it other disclosure obligations: it did not fully comply.

41. As such, on June 25, 2021, Dr. Alvarez was forced to send yet another letter requesting compliance.

42. By that correspondence, 1872 detailed Zamora's failure to provide documentation relating to its marketing efforts on behalf of Matusalem. Dr. Alvarez wrote:

With regard to IPCA:

Zamora reported total IPCA expenses of 446,503€. But that figure was not supported by any invoices despite our auditors' repeated request for that information (regarding both promotion of goods and "atypical activities" as defined by Zamora). We hereby reiterate our request that Zamora produce invoices and other supporting documentation necessary for us to understand fill of those expenditures.

Additionally, and even more troublingly, to date our audit has revealed that approximately 61% of Zamora's total reported IPCA for 2020 came in the form of cases of our products being provided by Zamora without charge to unidentified clients. Indeed, Zamora has provided no information relating to the identities of the clients receiving our product for free or the amount and value of our products being given to each such client. We have not even been told the names of the top 10 clients receiving such free cases, which alone have a total reported value of 91,732.80€. It is absolutely critical that Zamora provide us with the information detailing the names and amounts of all the clients that received the free cases.

Moreover, in light of the foregoing disclosures, we now need to know the extent to which Zamora has been giving away the product of the other brands it distributes within its territory. As you know, Zamora is contractually obligated to avoid any actions that "may adversely affect or diminish the value of [1872's] Products or the sale of the Products," and we are concerned about the high volume of products being given away for free in your territory. Because protecting our brand is a central tenet of the parties' Agreement, 1872 is well within its rights to demand detailed information regarding both the extensive giveaways of our products and the extent to which Zamora is treating our brand differently than it is treating its other brands with regard to such giveaways.

With regard to IPMA:

As regards the 752,746€ in marketing expenses reported by Zamora, again we have not been provided with supporting invoices corresponding to cases without charge (at an aggregate cost of 40,122 €). As detailed herein, that issue of special concern to 1872 given the negative impact of product giveaways on our brand.

In addition, we also have not received adequate back-up (including invoices) for advertising material relating to our products (with an aggregate cost of 175,535.83€). In some cases, we have received no back-up at all for those expenditures. In other cases, we were given invoices but not as to per diems and representation expenses. And finally, as to many of those marketing expenses, we have not been provided with documents or information that allow us to confirm that such expenses were actually associated with Matusalem branded products, that is to say, as to 175,535.83€ worth of marketing expenses, Zamora has not provided 1872 with enough information to allow us to appreciate the nature of the expenditure or how a given expenditure actually related to the promotion of our brand.

43.     1872 thus detailed both the nature and import of the information that Zamora was withholding from the auditors.

44.     Zamora responded by, *inter alia,* denying that it had done anything wrong and refusing to produce the requested information, claiming that it was unable to provide "sensitive information about competing products that Zamora cannot reveal due to [unstated] legal and commercial restrictions."

45.     But despite Zamora's failure to provide all of the information it was obligated to turn over, the Audit nonetheless revealed the Distributor's failure to meet its overarching obligation to market Matusalem's products with at least as much vigor as it applied to its other brands – including its own products. Indeed, it was clear that in addition to stockpiling inventory, Zamora was also damaging the brand giving away a substantial amount of Matusalem's products for free to undisclosed recipients and potentially using 1872 marketing funds to promote other customers' products.

## Zamora Stops Paying 1872's Invoices

46.     Finally, improperly claiming the right to "offset" its purported entitlement of a bonus against monies it owed 1872 for the purchase of product, Zamora began to withhold the payments that were due for the products it bought.

47.     Indeed, as of the filing of this Complaint, Zamora has failed to timely pay a total of €497,164.43 that it owes 1872 for products that Zamora has purchased.

48.     1872 has retained undersigned counsel and is required to pay them an agreed-upon amount of attorneys' fees and costs.

49.     All claims pleaded herein accrued within the applicable statutory limitations periods.

50.     Any and all applicable preconditions to suit have occurred or have been waived.

## COUNT I
## SPECIFIC PERFORMANCE
### (TO REQUIRE COMPLIANCE WITH CONTRACTUAL AUDIT PROVISIONS)

51. 1872 re-alleges and re-incorporates paragraphs 1 through 50 as if fully set forth herein.

52. 1872 and Zamora are parties to the Agreement, which is a valid and binding contract the terms of which are clear, definite, certain, and complete. Among those terms is 1872's express right to audit the books and records of Zamora as set forth in ¶8.7 of the Agreement.

53. 1872 has complied with the Agreement and remains ready, willing, and able to do so. And, as detailed herein and otherwise, 1872 has provided Zamora with written notices of its breaches of the Agreement, but those breaches remain uncured.

54. But Zamora has materially breached the Agreement by failing to provide documents and other information requested by 1872 in breach of ¶8.7 of the Agreement. Zamora is obligated to fully comply with the requests for information 1872 has made in connection with its ongoing Audit.

55. 1872 has no adequate remedy at law for the breach of the Agreement alleged in this Count. The Agreement expressly requires the Distributor to provide full and complete information regarding its sales, marketing, and commercial activities, without which 1872 cannot be fully aware of the extent of the Distributor's non-compliance with the essential terms of the parties' Agreement – including the potential misuse of 1872 marketing funds to support Zamora's other products.

WHEREFORE, Plaintiff demands judgment against Zamora to specifically perform its obligations under the Agreement by providing the materials requested by 1872 in its ongoing Audit, attorneys' fees and costs pursuant to ¶5.3 of the Agreement, pre- and post-judgment interest, costs, and all such other and further relief as the Court deems just and proper.

## COUNT II
### BREACH OF CONTRACT
### (FAILURE TO PROMOTE 1872'S PRODUCTS)

56. 1872 re-alleges and re-incorporates paragraphs 1 through 50 as if fully set forth herein.

57. 1872 and Zamora are parties to the Agreement, which is a valid and binding contract.

58. As detailed herein, Zamora materially breached the Agreement by failing to use its commercially reasonable efforts to distribute, sell, and expand the market for Matusalem's Products in Spain by failing to use at least the same effort, diligence, and attention to the distribution, sale, and marketing of each of Matusalem's Products as the Distributor uses in the distribution, sale, and marketing of its other major brands in the Territory. Rather, Zamora prioritized its own brands over 1872's products.

59. Zamora has thereby breached, *inter alia*, ¶8.1 of the Agreement.

60. As detailed herein and otherwise, 1872 has repeatedly provided Zamora with written notices of its breaches of the Agreement, but those breaches remain uncured.

61. 1872 has suffered damages as a result of Zamora's breach of the Agreement.

WHEREFORE, Plaintiff demands judgment against Zamora for damages, attorneys' fees and costs pursuant to ¶5.3 of the Agreement, pre- and post-judgment interest, costs, and all such other and further relief as the Court deems just and proper.

## COUNT III
### BREACH OF CONTRACT
### (FAILURE TO PAY INVOICES)

62. 1872 re-alleges and re-incorporates paragraphs 1 through 50 as if fully set forth herein.

63. 1872 and Zamora are parties to the Agreement, which is a valid and binding contract.

64. Zamora materially breached the Agreement by failing to timely pay invoices for its purchase of product in violation of, *inter alia*, ¶4 of the Agreement.

65. As detailed herein and otherwise, 1872 has provided Zamora with written notices of its breaches of the Agreement, but those breaches remain uncured.

66. 1872 has suffered damages as a result of Zamora's breach of the Agreement.

WHEREFORE, Plaintiff demands judgment against Zamora for damages, attorneys' fees and costs pursuant to ¶5.3 of the Agreement, pre- and post-judgment interest, costs, and all such other and further relief as the Court deems just and proper.

Dated: September 7, 2021.

                Respectfully submitted,

                By: /s Scott M. Dimond
                    Scott M. Dimond, Esq.
                      Fla. Bar No.: 995762
                      Sdimond@dkrpa.com
                    Lorenz Michel Prüss, Esq.
                      Fla. Bar No.: 581305
                      Lpruss@dkrpa.com
Secondary Email: vceballos@dkrpa.com
Dimond Kaplan & Rothstein, P.A.
2665 South Bayshore Drive, PH-2B
Miami, Florida 33133
Telephone:   (305) 374-1920

                By: /s Jose Ortiz
                    Jose Ortiz, Esq.
                      Fla. Bar No.: 182321
                      jortiz@homerbonner.com
Secondary email: MOsorio@homerbonner.com
Homer Bonner Jacobs Ortiz
1200 Four Seasons Tower
1441 Brickell Avenue
Miami Florida 33131
Telephone:   (305) 350-5100
*Counsel for 1872*